**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

BUREAU OF CONSUMER FINANCIAL
PROTECTION,

        Plaintiff,

   v.

FIFTH THIRD BANK,
NATIONAL ASSOCIATION,

        Defendant.

Case No. 1:20-cv-01683

Judge Andrea R. Wood

Magistrate Judge Young B. Kim

**DEFENDANT'S MOTION TO TRANSFER VENUE**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................... 1

II.     BACKGROUND ....................................................................................................... 3

    A.  Fifth Third's Management and Operations are Concentrated in Ohio ........................... 3

    B.  The Bureau's Investigation Collected Bank Documents and Records that Were Gathered in Ohio by Ohio-Based Personnel ................................................................. 5

III.    THIS CASE SHOULD BE TRANSFERRED TO THE SOUTHERN DISTRICT OF OHIO ........................................................................................... 7

    A.  The Convenience of the Parties and Witnesses Weighs in Favor of Transfer ............... 8

    B.  The Interests of Justice Support Transfer ..................................................................... 12

IV.     CONCLUSION ....................................................................................................... 14

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*,
  571 U.S. 49 (2013)............................................................................................7

*Christakis v. Fifth Third Bancorp, et al.*,
  Case No. 1:20-cv-02176-SLE (Apr. 7, 2020) (N.D. Ill.) ...........................................6

*Coffey v. Van Dorn Iron Works*,
  796 F.2d 217 (7th Cir. 1986) ...................................................................................7

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,
  No. 13-CV-13167, 2015 WL 5610813 (D. Mass. Sept. 23, 2015) .............................10, 12, 13

*Consumer Fin. Prot. Bureau v. Global Client Solutions, LLC*,
  No. 14-CV-6643 (C.D. Cal. Aug. 25, 2014), ECF No. 1...........................................8

*Consumer Fin. Prot. Bureau v. Golden Valley Lending, Inc.*,
  No. 17-CV-3155, 2017 WL 3970514 (N.D. Ill. Sept. 8, 2017) ...........................................9, 10

*FTC v. Acquinity Interactive, LLC*,
  No. 13-CV-5380, 2014 WL 37808 (N.D. Ill. Jan. 6, 2014)....................................................12

*Int'l Star Registry of Ill. v. Omnipoint Mktg., LLC*,
  No. 05-CV-6923, 2006 WL 2598056 (N.D. Ill. Sept. 6, 2006) ...............................11

*Johnson v. United Airlines, Inc.*,
  No. 12-CV-5842, 2013 WL 323404 (N.D. Ill. Jan. 25, 2013)..................................8

*Law Bulletin Publ'g, Co. v. LRP Publ'ns, Inc.*,
  992 F. Supp. 1014 (N.D. Ill. 1998) .........................................................................8

*RAH Color Techs. LLC v. Xerox Corp.*,
  No. 17-CV-6813, 2018 WL 9539781 (N.D. Ill. Sept. 24, 2018) ............................10

*Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*,
  626 F.3d 973 (7th Cir. 2010) ..............................................................................8, 9

*Rudd v. Lux Prods. Corp. Emerson Climate Techs. Braeburn Sys., LLC*,
  No. 09-CV-6957, 2011 WL 148052 (N.D. Ill. Jan. 12, 2011).................................12

*Stewart Org., Inc. v. Ricoh Corp.*,
  487 U.S. 22 (1988)....................................................................................................7

*Tomkins v. Forte Capital Partners, LLC*,
  No. 05-CV-5251, 2006 WL 907776 (N.D. Ill. Apr. 5, 2006)..................................11

*Van Dusen v. Barrack*,
    376 U.S. 612 (1964)..........................................................................................7

*Windsor v. United Parcel Serv.*,
    No. 15-CV-11119, slip op. (N.D. Ill. Sept. 28, 2016)............................................10

## OTHER AUTHORITIES

12 U.S.C. § 5564(f)....................................................................................................8

28 U.S.C. § 1404(a) ...........................................................................................1, 2, 7

Consumer Financial Protection Act, 12 U.S.C. § 5531 ...............................................6

Fed. R. Civ. P. 45(c)(1)..............................................................................................9

Truth in Lending Act, 15 U.S.C. § 1601 .....................................................................6

Truth in Savings Act, 12 U.S.C. § 4301 .....................................................................6

After conducting an extensive three-year investigation of this Ohio-based bank, the Consumer Financial Protection Bureau ("Bureau") filed this lawsuit in the Northern District of Illinois accusing Fifth Third Bank, N.A. ("Fifth Third" or the "Bank") of failing to prevent employees from opening unauthorized customer accounts between 2010 and 2016. Fifth Third respectfully moves to transfer this action to the Southern District of Ohio pursuant to 28 U.S.C. § 1404(a) where it could have and should have been brought.[1]

## I.    INTRODUCTION

For 162 years, Fifth Third has called Ohio home. Throughout the relevant period covered by this lawsuit—2010 to 2016—Fifth Third was a state-chartered bank operating under authority from the State of Ohio. Fifth Third's leadership team directed the Bank's operations—including the Retail Banking, Call Center, Compliance, Legal, Human Relations, and Employee Relations functions, to name a few—and administered Corporate Investigations charged with uncovering employee misconduct in failing to follow bank rules from its headquarters in Cincinnati, Ohio. Although the Bank's branch network spans ten states, there were far more customers, branches, and employees in Ohio than in any other state and approximately three times as many as in Illinois. Ignoring the fact that it collected thousands of documents and nearly a half billion data points from the Bank's operations and servers in and around Cincinnati, Ohio, the Bureau disregards its established practice of suing where the defendant is based.

If the investigation is any indication, this case will involve an extremely large volume of documents and data, with related discovery issues, and present a number of challenging questions. For instance, why include claims that pre-date the Bureau's enforcement authority

---

[1] Fifth Third sought the Bureau's consent to transfer this case to the Southern District of Ohio during a meet-and-confer call on April 17. The Bureau informed counsel on April 20 that it declined to do so.

when other courts have ruled such claims to be impermissibly retroactive?  Why pursue claims that are plainly barred by the statute of limitations?  And why pursue a novel claim that it was "abusive" to provide two products and services to customers who were not charged for them and received only a benefit?  These and other crucial questions must be decided early on because they go to the heart of the Bureau's complaint and will shape discovery.  The question presented before confronting these legal issues and daunting discovery challenges is whether this case even belongs in Illinois, or whether these questions are better answered by a federal court in Ohio. That is an easy question to answer.

  This case should be transferred to the Southern District of Ohio.  *See* 28 U.S.C. § 1404(a).  There can be no dispute that the case could have been brought there, transfer would be substantially more convenient for the parties and witnesses, including third-party witnesses, and doing so would promote the interests of justice.  The convenience of the parties and witnesses points unanimously toward the Southern District of Ohio.  Fifth Third's headquarters and principal place of business is in Cincinnati, which is where the Board meets, management leads, and regulators supervise.  All of its key operations—including those implicated by this lawsuit—are based there, as are most or all of the documents that were produced to the Bureau during its investigation.  Of the more than 10 million accounts the Bureau examined during the period between 2010 and 2016, far more were opened in Ohio than in any other state.  And to the extent that Fifth Third received complaints from customers about unauthorized accounts—there were only 424 complaints out of more than 10 million customer accounts during the seven-year period from 2010 to 2016—those were received, processed, and investigated in Ohio.  Likewise, to the extent that customers were found to have incurred losses and reimbursed for any fees that

were caused by bank employees who disregarded their training and Fifth Third's policies—approximately $30,000 over the 10 million customer accounts—this too was authorized in Ohio.

The interests of justice also support transfer. Ohio plainly has the most substantial interest in the adjudication of this case, which centers on a bank founded and headquartered there, and the witnesses who will testify at trial are far more likely to reside in Ohio than anywhere else so that access to live (as opposed to videotaped) testimony is far better in Ohio. Fifth Third serves Ohio residents extensively, which is not surprising given the concentration of branches and employees in Ohio that far outnumber any other state in which it does business.

## II.     BACKGROUND

### A.     Fifth Third's Management and Operations are Concentrated in Ohio

Fifth Third's ties to Ohio overwhelmingly outweigh Illinois. Since its founding in 1858, Fifth Third has maintained its headquarters and principal place of business in Cincinnati, Ohio. Elmore Decl. ¶ 3. Fifth Third's leadership team operates from the Bank's headquarters in Ohio. *Id.* ¶ 4. All of its executive officers and many of its senior officers work in Ohio, including its President and Chief Executive Officer, Chief Financial Officer, Chief Legal Officer, Chief Risk Officer, and the heads of Retail Banking, Consumer Banking, Human Relations, Employee Relations, and Corporate Investigations. *Id.*

Every key function relevant to this litigation occurs in Ohio. For example, customer complaints received by telephone, online, or by mail are handled in Ohio. *Id.* ¶ 10. The Office of the President, which handles written complaints, is based at the Bank's operations center in Cincinnati. *Id.* The Bank's call centers, which handle customer questions and complaints, are located predominately in Ohio with only a satellite location in Michigan and none in Illinois. *Id.* Internal investigations into alleged employee misconduct are handled by Corporate Investigations, which is based in Cincinnati. *Id.* ¶ 4. And of course the Bank's leadership team,

which sets corporate strategy and decides the Bank's incentive compensation system, operates from its Cincinnati-based headquarters. *Id.*

Whether one examines the number of employees, the number of branches, or the number of customers, the balance again tilts heavily towards Ohio. Presently, there are more than 6,900 employees working in Cincinnati, and 9,615 employees throughout the state of Ohio. *Id.* ¶ 5. For every year between 2010 and 2016, there were more employees working in Ohio than in any other state within Fifth Third's regional footprint. *Id.* To illustrate, between 2010 and 2016 Fifth Third employed more than three times the number of employees in Ohio (35,000) than in Illinois (10,623). *Id.*

Fifth Third has branches in ten states, but geographically they are more concentrated in Ohio than in any other state. *Id.* ¶ 6. Between 2010 and 2016, Fifth Third had 379 branches in Ohio. By contrast, Illinois had only 168 branches during this time period, which ranked fourth among the states in Fifth Third's footprint. *Id.* Both Michigan (232) and Florida (182) had more branches than Illinois during this time period, but their branch numbers still trailed Ohio by a substantial margin. *Id.*

The same pattern holds when one examines Fifth Third's customer base. By far the largest portion of Fifth Third's customer base was located in Ohio during the relevant period. In 2016, nearly 35% (3,225,063) of consumer accounts were located in Ohio, whereas less than 10% (916,675) of consumer accounts were in Illinois. *Id.* ¶ 7. The number of Ohio-based customers surpassed Illinois for every preceding year dating back to 2010. *Id.* This same disparity existed every year between 2010 and 2016 across all products and services including those at issue in this litigation. *Id.* ¶ 8. For example, there were more than three times the number of deposit (checking and savings) accounts in Ohio (1,669,232) compared to Illinois

(547,357) in 2016. *Id.* Likewise, there were more than three times the number of Early Access accounts (230,573) in Ohio than were in Illinois (64,652). *Id.* And there were nearly three times the number of credit card accounts in Ohio (871,138) than in Illinois (297,666) in 2016. *Id.* Similar disparities for each product or service existed in each preceding year dating back to 2010. *Id.*

Fifth Third deposit account balances tell the same story. In 2016, Fifth Third had nearly $16.1 billion in consumer accounts in Ohio, compared to less than $5.4 billion in Illinois. *Id.* ¶ 9. A similar 3:1 disparity existed in each preceding year dating back to 2010. *Id.*

B. **The Bureau's Investigation Collected Bank Documents and Records that Were Gathered in Ohio by Ohio-Based Personnel**

The Bureau commenced its investigation into Fifth Third's sales practices on November 3, 2016, with a Civil Investigative Demand ("CID") addressed to the Bank's President and CEO in Cincinnati. *Id.* ¶ 12. In response to that CID and five subsequent ones served on the Bank's counsel over the next three years, Fifth Third provided the Bureau with information concerning more than 10 million consumer accounts and products, amounting to more than 480 million data points in total for the period between 2010 and 2016. *Id.* These were produced from the Bank's servers located across the Ohio River in Florence, Kentucky, a scant 15 miles from Fifth Third's headquarters, by the Bank's Information Technology teams operating in Cincinnati. *Id.* Fifth Third also produced more than 50,000 pages of documents and emails to the Bureau. *Id.* Those documents were principally collected from the Bank's records in Ohio, with assistance from its Cincinnati-based personnel. *Id.*

As we explained, the astonishingly small number of customer complaints received by Fifth Third about unauthorized products and services—just 424 throughout the Bank between 2010 and 2016, or about one in every 23,585 accounts—were reviewed and investigated in Ohio.

*Id.* ¶ 10.  Fifth Third's internal control systems detected, investigated, and when appropriate remediated unauthorized customer accounts over a seven-year period, which proved to be a tiny percentage of its customers and accounts and an exceptionally small amount of customer harm requiring redress.  *Id.* ¶ 14.  Between 2010 and 2016, Fifth Third identified fewer than 1,100 such accounts out of the more than 10 million accounts opened at Fifth Third during that period. *Id.*  Fifth Third long ago redressed the affected customers, which was less than $30,000, in nearly every case before the Bureau began its investigation.  *Id.*  Fifth Third's operations in Ohio provided documentation regarding each investigation, including the disciplinary action taken, to the Bureau during its investigation.  *Id.*  The Bureau has declined repeated requests to identify any accounts it believes to be unauthorized, other than those Fifth Third itself had already identified and voluntarily corrected.  *Id.*; *see generally* Compl. ¶¶ 18–34.

On March 9, 2020, the Bureau sued Fifth Third in the Northern District of Illinois alleging violations of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5531, the Truth in Lending Act, 15 U.S.C. § 1601, and the Truth in Savings Act, 12 U.S.C. § 4301.[2]  The Complaint claims that unspecified employees of Fifth Third engaged in unlawful sales practices by opening deposit and credit card accounts, and activating free, no-charge online banking and no-fee lines of credit (known as Early Access accounts) without consumers' knowledge or consent.  Compl. ¶ 5.  Products and services for which the Bank charged customers were alleged to be deceptive, and those that the Bank provided to customers without charge were, according to the Bureau, "abusive"—the theory being that it abused the customer to provide a free product or

---

[2]  On April 7, 2020, less than one month after the Bureau brought this action, an individual plaintiff purporting to represent a class of purchasers of Fifth Third securities filed a class action lawsuit in the Northern District of Illinois, under the apparent misapprehension that Fifth Third "is headquartered in this Judicial District."  *Christakis v. Fifth Third Bancorp, et al.*, Case No. 1:20-cv-02176-SLE (Apr. 7, 2020) (N.D. Ill.), at ¶ 13.  As of the filing date, Fifth Third has not yet been served with that complaint.

service without the customer's explicit approval.  The Complaint broadly claims that Fifth Third "took insufficient steps to properly implement and monitor its [compensation] program, detect and stop misconduct, and identify and remediate harmed consumers."  *Id.* ¶ 5.  It goes on to allege that Fifth Third "failed to change its sales practices to avoid consumer harm."  *Id.* ¶ 66.  The Complaint's allegations specific to Illinois are merely that Fifth Third "is located, resides, or does business in this district."  *Id.* ¶ 10.  Throughout the relevant period and up to today, policy decisions regarding Fifth Third's incentive compensation system, including the establishment of account quality requirements and incentive credit clawbacks, were made in Ohio, and the Bank's employee-monitoring programs were directed from Ohio.  Elmore Decl. ¶ 11.

## III. THIS CASE SHOULD BE TRANSFERRED TO THE SOUTHERN DISTRICT OF OHIO

A district court has discretion to transfer a case, "[f]or the convenience of parties and witnesses, [and] in the interest of justice, . . . to any other district . . . where it might have been brought."  28 U.S.C. § 1404(a); *see also Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986) ("The weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude, and, therefore, is committed to the sound discretion of the trial judge.").  This exercise of discretion requires the court to address both private and public interests involving the litigation.  *See Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 62 & n.6 (2013); *see also Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (courts "adjudicate motions for transfer according to an 'individualized case-by-case consideration of convenience and fairness'" (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

As an initial matter, there is no question that the action "might have been brought" in the Southern District of Ohio.  28 U.S.C. § 1404(a).  Cases under the CFPA may be brought in any

federal district "in which the defendant is located or resides or is doing business." 12 U.S.C.
§ 5564(f). Indeed, to do so is the Bureau's established practice from which it deviated in this
case. Fifth Third's principal place of business is in Ohio. Elmore Decl. ¶ 3. The only question,
accordingly, is whether a transfer would serve the private interests of the parties and the public
interest.

### A. The Convenience of the Parties and Witnesses Weighs in Favor of Transfer

When evaluating the convenience of the parties and witnesses (sometimes referred to as
the "private interests"), courts consider "all factors relevant to convenience." *Research
Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010). These
factors include "(1) the plaintiff's choice of forum; (2) the situs of material events; (3) the
relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the
convenience to the parties of litigating in the respective forums." *Law Bulletin Publ'g, Co. v.
LRP Publ'ns, Inc.*, 992 F. Supp. 1014, 1017 (N.D. Ill. 1998); *see also Research Automation*, 626
F.3d at 978 (considering "the availability of and access to witnesses, . . . each party's access to
and distance from resources in each forum[,] . . . the location of material events[,] and the
relative ease of access to sources of proof"). These factors strongly favor transfer to the
Southern District of Ohio.

First, while the Bureau's choice of forum merits some deference, such deference is
"substantially reduced" where, as here, the plaintiff does not reside in this District. *Johnson v.
United Airlines, Inc.*, No. 12-CV-5842, 2013 WL 323404, at *5 (N.D. Ill. Jan. 25, 2013). The
Bureau does not reside in this District, and only one of eight attorneys of record for the Bureau is
based in Chicago. Moreover, the Bureau would not be disadvantaged by litigating in Ohio and,

in fact, customarily files suit in the district of the defendant's principal place of business.[3]  The

Bureau's choice of forum is thus entitled to only minimal deference.

Second, the "location of material events" weighs in favor of transfer.  *Research*

*Automation*, 626 F.3d at 978.  The Complaint broadly claims that Fifth Third "took insufficient

steps to properly implement and monitor its [compensation] program, detect and stop

misconduct, and identify and remediate harmed consumers," Compl. ¶ 5, and further alleges that

Fifth Third "failed to change its sales practices to avoid consumer harm," *id.* ¶ 66.  These

allegations—as generalized as they are—go to the decision-making and oversight of the

numerous former and current officers and employees who are located in Cincinnati, including

those who set the Bank's compensation policy and investigated misconduct.  Elmore Decl. ¶¶ 4,

11.  The situs of any alleged violations of the CFPA is thus in Cincinnati.  Conducting a trial in

an inconvenient forum—especially when key witnesses reside and are employed beyond the

court's territorial jurisdiction and cannot be compelled to testify in this jurisdiction but whose

testimony instead can only be presented through deposition excerpts, *see* Fed. R. Civ. P.

45(c)(1)—will unnecessarily impinge on the conduct of this trial.

Another court in this District ordered transfer of a lawsuit brought by the Bureau because

the material events occurred elsewhere.  In *Consumer Financial Protection Bureau v. Golden*

*Valley Lending, Inc.*, No. 17-CV-3155, 2017 WL 3970514 (N.D. Ill. Sept. 8, 2017), the Bureau

filed suit in the Northern District of Illinois against lending institutions operating in Kansas.  The

---

[3]  In 77 cases out of the 98 (78.6%) filed since the Bureau's formation, the Bureau sued in the state of
the defendant's principal place of business.  In the minority of cases in which the Bureau has filed
elsewhere, the reason for the alternative forum is often evident from the face of the complaint.  *See,
e.g.*, Complaint, *Consumer Fin. Prot. Bureau v. Global Client Solutions, LLC*, No. 14-CV-6643 (C.D.
Cal. Aug. 25, 2014), ECF No. 1 ("Venue is proper in this district because a substantial amount of the
transactions, acts, practices, and courses of conduct constituting violations of Federal consumer
financial law occurred within this district.").  This is the rare case in which the Bureau has filed suit
outside the district where the defendant is based.

court observed that the defendants "use[d] [a] call center in Kansas to contact potential borrowers and administer the underwriting of the loans" in question, and rejected the claim that Illinois was an appropriate forum simply because there were "thousands of potential victims in Illinois." *Id.* at *2. "The problem with this argument" was that the defendants' customers "also reside in 16 other states beside Illinois, meaning that these states are also part of the 'situs of material events.'" *Id.* There was thus "nothing special about Illinois for this case." *Id.*

Other courts have granted transfer in similar circumstances. For example, the District of Massachusetts granted transfer of another lawsuit the Bureau filed in a jurisdiction that was largely unrelated to the alleged wrongdoing. *See Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. 13-CV-13167, 2015 WL 5610813, at *1 (D. Mass. Sept. 23, 2015). The court ruled that the case should be transferred to the jurisdiction in which "[t]he allegedly illegal activity at the heart of this case was apparently managed" and "where the individual defendant resides and the entity defendants perform most of their business"—namely, California. *Id.* This Court, moreover, has likewise held that transfer to a district closer to the defendant's principal place of business was appropriate, notwithstanding a plaintiff's contention that the defendant sold some products in this District. *See RAH Color Techs. LLC v. Xerox Corp.*, No. 17-CV-6813, 2018 WL 9539781, at *2 (N.D. Ill. Sept. 24, 2018) (transferring case to New York because "sales alone are insufficient to establish a substantial connection to the forum if the defendant's goods are sold in many states" (quotation marks omitted)); *see also Windsor v. United Parcel Serv.*, No. 15-CV-11119, slip op. at 4 (N.D. Ill. Sept. 28, 2016) (granting transfer to Indiana where "[t]he primary evidence . . . will revolve around conduct in the Northern District of Indiana and the bulk of what Plaintiffs will have to prove occurred there").

This case is analogous. There is nothing special about Fifth Third's connection to Illinois to justify litigating this case here. Whatever claim the Bureau may make about the number of potentially impacted consumers in Illinois, it is just one of ten states in which Fifth Third does business (in fact, it ranked number three or four of ten during the relevant period, depending on the metric), and is not the hub of Fifth Third's business. Moreover, Fifth Third's executive leadership is based in Cincinnati, not Chicago. The "situs of material events" thus is Cincinnati, and this factor therefore strongly favors transfer to that forum. *See Tomkins v. Forte Capital Partners, LLC*, No. 05-CV-5251, 2006 WL 907776, at *5 (N.D. Ill. Apr. 5, 2006) (granting transfer where the "material events giving rise to the . . . claims" occurred in a different district).

Third, with respect to the relative access to resources and the convenience of the witnesses, the relevant documents and party witnesses for Fifth Third are located principally in Cincinnati. *See Int'l Star Registry of Ill. v. Omnipoint Mktg., LLC*, No. 05-CV-6923, 2006 WL 2598056, at *6 (N.D. Ill. Sept. 6, 2006) ("[M]ost evidence for this litigation is likely to be found in Florida, primarily at the Defendants' principal places of business."). Witnesses with relevant information are far more likely to be in Ohio, because the claims here are largely directed at the policies and monitoring efforts of the Bank, led by the senior officers in Cincinnati. In fact, all three of the witnesses who testified during the investigation are located in Cincinnati. Elmore Decl. ¶ 13. And limiting the travel demands on essential witnesses will be a crucial consideration once stay-at-home pandemic orders are relaxed, particularly with the need to remain vigilant for second or third waves of coronavirus outbreaks.

Furthermore, far more of the 10 million accounts that the Bureau investigated were opened in Ohio than in any other state. *Id.* ¶ 7. More than one-third of the accounts during the relevant time period were located in Ohio; by contrast, accounts in Illinois constituted less than

11

10% of Fifth Third's customer base.  *Id.*  Any third-party witnesses who owned Fifth Third accounts therefore are likely to be concentrated in Ohio.  The Bureau, for its part, "has not identified any potential witnesses in this district."  *FTC v. Acquinity Interactive, LLC*, No. 13-CV-5380, 2014 WL 37808, at *4 (N.D. Ill. Jan. 6, 2014).  And all of the individuals who provided information or documents in response to the Bureau's investigation demands were based in Ohio; none are based out of Illinois.  Elmore Decl. ¶ 13.

Finally, the relative convenience to the parties weighs in favor of transfer.  Only one of the eight attorneys listed as counsel of record for the Bureau is located in Chicago.  Compl. 17.  By contrast, virtually all members of Fifth Third's internal legal team involved in this case are located in Cincinnati, with one lawyer in New York.  Elmore Decl. ¶ 4.  Those attorneys would be required to travel to Chicago for hearings and other court-related business on a regular basis.  Illinois is a decidedly inconvenient forum, and it benefits no one to litigate this complex case in this District.

### B.  The Interests of Justice Support Transfer

The interests of justice also weigh heavily in favor of transfer.  As the state in which Fifth Third maintains its headquarters and principal place of business, Ohio has by far the most substantial interest in this litigation.  *See Rudd v. Lux Prods. Corp. Emerson Climate Techs. Braeburn Sys., LLC*, No. 09-CV-6957, 2011 WL 148052, at *7 (N.D. Ill. Jan. 12, 2011) ("[Defendant] is a Missouri company with its principal place of business in St. Louis, Missouri, and has an interest in a court in its own state deciding liability and damages.").  Between 2010 and 2016, which is the relevant period for the Bureau's investigation, Fifth Third operated far more branches in Ohio (379) than in any other state, with Illinois running a distant fourth (168).  Elmore Decl. ¶ 6.  By contrast, there is no allegation that Illinois has any greater interest in this litigation than the other nine states in which Fifth Third conducts business.  *See CashCall, Inc.*,

12

2015 WL 5610813, at *1 (granting transfer where "Massachusetts [was] one of sixteen States whose laws and public interests [were] implicated by the plaintiff's complaint, and its interests seem[ed] relatively minor in comparison to other involved States"). There is no sound reason why it should fall to this Court to oversee this complex case when the Bureau has specified no basis for suing here and Ohio has the most substantial interest in the resolution of this matter.

The interests of justice would be best served by litigating this case in Ohio. As we have pointed out, this is a case involving seven years of conduct, more than ten million customer accounts, four products and services, a half-billion data points already produced by the Bank, and a host of legal issues of varying degrees of complexity and novelty. It will unquestionably absorb a considerable, and probably disproportionate, amount of time of any tribunal which must oversee and try it. Furthermore, the supervisory burdens will be considerably greater for an Illinois court than an Ohio court because the witnesses, documents, servers, and events all are sited in or accessed from Ohio. Discovery disputes will be held in multiple districts, not just in one. If this case were ultimately tried to a jury in this District, it will be far more complicated and confusing for the jury as many of the witnesses will be based in Ohio and cannot be summoned to testify in person. This subjects the jury to days of stenographic excerpts or video clips which, while permissible, are notably inefficient, confusing, and irritating to jurors. If trials must be conducted like this, then the court can of course do so. Here, however, there is no reason for that to occur: a transfer to where the case could and should have been brought can be simply and easily accomplished and will solve virtually all of the problems. In the end, the efficient administration of justice favors Ohio.

13

## IV.    CONCLUSION

For the foregoing reasons, Fifth Third respectfully requests that the Court grant its motion to transfer venue to the Southern District of Ohio.

Dated: April 20, 2020                                    Respectfully submitted,

*/s/Michael Ferrara*
DINSMORE & SHOHL LLP
Michael J. Ferrara (#6282845)
222 W. Adams St. #3400
Chicago, IL 60606
773-710-9938
Michael.Ferrara@Dinsmore.com


WILLIAMS & CONNOLLY LLP
John K. Villa (*pro hac* application pending)
Enu Mainigi (*pro hac* application pending)
Ryan Scarborough (*pro hac* application pending)
Yifan Wang (*pro hac* application pending)
725 12th Street, N.W.
Washington, DC 20005
202-434-5000
jvilla@wc.com
emainigi@wc.com
rscarborough@wc.com
ywang@wc.com


GIBSON DUNN & CRUTCHER LLP
Jason Mendro (*pro hac* application pending)
Joshua Wesneski (*pro hac* application pending)
1050 Connecticut Avenue, N.W.
Washington, DC  20036
202-887-3726
jmendro@gibsondunn.com
jwesneski@gibsondunn.com

*Attorneys for Defendant Fifth Third Bank, N.A.*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney hereby certifies that on April 20, 2020, the foregoing Motion to Transfer Venue was electronically filed with the Clerk of the Court by utilizing the CM/ECF System, which will provide electronic notification to all counsel of record.

*/s/ Michael J. Ferrara*